Slip Op. 14-2

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JBF RAK LLC, <br><br>             Plaintiff, <br><br>       v. <br><br> UNITED STATES, <br><br>             Defendant, <br><br>       and <br><br> MITSUBISHI POLYESTER FILM, INC. and SKC, INC., <br><br>             Defendant-Intervenors. | Before: Judith M. Barzilay, Senior Judge <br><br> Court No. 11-00141 <br> **Public Version** |

**OPINION**

[Commerce's final results are sustained.]

January 8, 2014

*Jack D. Mlawski*, Galvin & Mlawski, for Plaintiff.

*Stuart F. Delery*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, (*Stephen C. Tosini*), Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of counsel, *George H. Kivork*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant.

*Ronald I. Meltzer*, *Patrick J. McLain*, *David M. Horn*, and *Jeffrey I. Kessler*, Wilmer Cutler Pickering Hale and Dorr LLP, for Defendant-Intervenors.

        BARZILAY, Senior Judge:  Before the court is Plaintiff JBF RAK LLC's ("JBF RAK") motion for judgment on the agency record under USCIT Rule 56.2, challenging Defendant U.S. Department of Commerce's ("Commerce") final results of the first administrative review

covering polyethylene terephthalate film ("PET Film") from the United Arab Emirates. *See Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates*, 76 Fed. Reg. 22,867 (Dep't Commerce Apr. 25, 2011) (final results) ("*Final Results*"); *Issues and Decision Memorandum for Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, A-520-803 (Apr. 18, 2011) ("*Issues and Decision Memorandum*"), available at http://enforcement.trade.gov/frn/summary/UAE/2011-9967-1.pdf (last visited Jan. 2, 2014). Specifically, JBF RAK challenges (1) Commerce's use of zeroing in its antidumping duty calculation; (2) Commerce's 15-Day Rule for issuing liquidation instructions; and (3) Commerce's home market sales determination. This case was stayed pending resolution of the zeroing issue presented in *Union Steel v. United States*, 713 F.3d 1101 (Fed. Cir. 2013) ("*Union Steel*"). Although the Federal Circuit concluded that Commerce's zeroing practice is lawful, JBF RAK continues to challenge Commerce's use of zeroing. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). For the reasons set forth below, the court sustains Commerce's *Final Results*.

## I. STANDARD OF REVIEW

When reviewing Commerce's antidumping determinations under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains Commerce's determinations, findings, or conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is "reasonable and supported by the record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotations and citation omitted). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. BACKGROUND

JBF RAK is a manufacturer and exporter of PET Film from the United Arab Emirates. JBF RAK and other interested parties requested that Commerce conduct an administrative review of the antidumping duty order on PET Film.  On December 23, 2009, Commerce initiated an administrative review of the antidumping duty order on PET Film from the United Arab Emirates for the period of November 6, 2008, through October 31, 2009. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 74 Fed. Reg. 68,229 (Dep't Commerce Dec. 23, 2009).  Commerce published its preliminary results and assigned JBF RAK a preliminary weighted average dumping margin of 4.76% *ad valorem*. *See Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates*, 75 Fed. Reg. 78,968 (Dep't Commerce Dec. 17, 2010) (preliminary results).  In the *Final Results*, Commerce revised the preliminary rate and assigned JBF RAK a weighted average dumping margin of 4.88% *ad valorem*. *See Final Results*, 76 Fed. Reg. 22,867.

### III. DISCUSSION

*A. Zeroing*

JBF RAK maintains that Commerce's use of zeroing in this case is unlawful. JBF RAK advances the same argument raised in *Union Steel*, *JTEKT Corp. v. United States*, 642 F.3d 1378 (Fed. Cir. 2011) ("*JTEKT*"), and *Dongbu Steel Co., Ltd. v. United States*, 635 F.3d 1363 (Fed. Cir. 2011) ("*Dongbu*"), which questions whether Commerce may interpret 19 U.S.C. § 1677(35) one way in the context of an administrative review and another way in the context of an antidumping investigation. Pl. Br. 7. Even though *Union Steel* resolved this question, JBF RAK argues for the first time in its reply brief that the Federal Circuit's decision in *Union Steel* is contrary to its prior decisions in *JTEKT* and *Dongbu*. Pl. Reply Br. 4-5. JBF RAK has also indicated that it plans to appeal an adverse decision in this case and request *en banc* review on the issue of zeroing. *See* Pl. Mot. For Test Case Designation, Docket Entry No. 69 (Aug. 14, 2013).

*Union Steel* has resolved the zeroing issue presented here. In *Union Steel*, the Federal Circuit concluded that Commerce's explanation for interpreting § 1677(35) differently in administrative reviews versus investigations constitutes a reasonable interpretation of the statute under the second step of *Chevron*. *See Union Steel*, 713 F.3d at 1110. This case involves the very same issue. Pl. Br. 7.[1] Given that *Union Steel* is binding authority, the court must sustain Commerce's zeroing methodology in this case as a permissible interpretation of the statute. *See id.* at 1110.

---

[1] The court will not consider JBF RAK's new argument challenging the Federal Circuit's decision in *Union Steel*.

## B. 15-Day Liquidation Policy

JBF RAK also challenges Commerce's 15-day liquidation policy. It makes the following argument:

> In Count five of JBF's Complaint, JBF states that [Commerce's] policy of issuing liquidation instructions fifteen days after the final results of administrative reviews . . . is unlawful and contrary to this court's decision in *SKF USA Inc. v. United States*, Slip Op. 10-57 (CIT May 17, 2010) . . . . See JBF Complaint 36-37. Most recently, this court awarded declaratory judgment finding Commerce's statement in the Final Results declaring its intention to issue liquidation instructions 15 days after publication of the final results is unlawful. *SKF USA Inc. v. United States*, Slip Op. 11-121 (CIT Oct. 4, 2011) ("*SKF VI*"). As in *SKF VI*, the Final Results here also stated Commerce's intention to issue assessment instructions 15 days after publication of the Final Results, necessitating Plaintiff's submission of, and the Courts [sic] issuing a Temporary Restraining Order before the expiration of the 15 day period. Thus, Plaintiff requests a declaratory judgment finding Commerce's 15 day rule is unlawful. However, Plaintiff also seeks costs as it has no confidence that Commerce will change its practice notwithstanding the declaratory judgment. Indeed, this court has held that Commerce ignored this court's decisions in analogous circumstances where it found Commerce's 15 day rule is unlawful. . . .

Pl. Br. 18.

Defendant, however, claims that JBF RAK failed to raise this issue in the administrative proceeding before Commerce and therefore failed to exhaust its administrative remedies. Def. Br. 18. Defendant also argues (if the exhaustion requirement is waived) that Commerce's 15-day policy constitutes a reasonable interpretation of the statute. Def. Br. 19 (citing *Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 502 F. Supp. 2d 1295 (2007)). JBF RAK, though, contends that it would have been futile to raise the issue below given that Commerce continues to apply its 15-day policy despite the *SKF* decisions declaring it unlawful. Pl. Reply Br. 9-10.

There is no dispute that JBF RAK failed to raise this issue before Commerce. JBF RAK amended its complaint to add this claim challenging Commerce's 15-day liquidation instruction policy. The Federal Circuit has explained that

> section 2637(d) "indicates a congressional intent that, absent a strong contrary reason, the [trade] court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed.Cir.2007). The requirement that invocation of exhaustion be "appropriate," however, requires that it serve some practical purpose when applied. Inquiry into the purposes served by requiring exhaustion in the particular case, and any harms caused by requiring such exhaustion, is needed to determine appropriateness.
>
> Requiring exhaustion can protect administrative agency authority and promote judicial efficiency. *McCarthy v. Madigan*, 503 U.S. 140, 145, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). The requirement can protect an agency's interest in being the initial decisionmaker in implementing the statutes defining its tasks. *Id*. And it can serve judicial efficiency by promoting development of an agency record that is adequate for later court review and by giving an agency a full opportunity to correct errors and thereby narrow or even eliminate disputes needing judicial resolution. *Id*. at 145–46, 112 S.Ct. 1081. At the same time, "the interest of the individual in retaining prompt access to a federal judicial forum" is taken into account in deciding when exhaustion is demanded in order to protect "institutional interests." *Id*. at 146, 112 S.Ct. 1081.
>
> Courts have recognized several recurring circumstances in which institutional interests are not sufficiently weighty or application of the doctrine would otherwise be unjust. For example, a party often is permitted to bypass an available avenue of administrative challenge if pursuing that route would clearly be futile, *i.e.*, where it is clear that additional filings with the agency would be ineffectual." *Id*. (citing *Corus Staal*, 502 F.3d at 1378–79 (futility applies in situations where plaintiffs "would be 'required to go through obviously useless motions in order to preserve their rights'")). Requiring exhaustion may also be inappropriate where the issue for the court is a "pure question of law" that can be addressed without further factual development or further agency exercise of discretion. *See Agro Dutch*, 508 F.3d at 1029. In such circumstances, among others, requiring exhaustion may serve no agency or judicial interest, may cause harm from delay, and may therefore be inappropriate.

*Itochu Bldg. Prods. v. United States*, 2013 WL 4405863 at *4 (Fed. Cir. Aug. 19, 2013).

The court is not convinced that the futility exception applies here. Commerce has exercised its gap-filling, policy-making discretion through its practice of issuing liquidation instructions 15-days after publication of the final results. JBF RAK's failure to challenge the 15-day policy before Commerce has left the court with no record to review on the issue. Missing from the administrative record are Commerce's considered views on its policy, the statute, or applicable case law. The court does not have Commerce's response to JBF RAK's arguments

(which were never made). Therefore, the court needs Commerce's explanation of its policy to properly review this legal issue. As a general matter, it is preferable (even if not always technically required) to have the agency's views established on the administrative record, a principle equally applicable to legal interpretations as well as factual findings. 2 Richard J. Pierce, Jr., ADMINISTRATIVE LAW TREATISE § 14.3 (5th ed. 2010).

Requiring exhaustion in this instance will also protect "administrative agency authority" and "promote judicial efficiency." *Itochu Bldg. Prods.*, 2013 WL 4405863 at *4. For example, the court would encroach on administrative agency authority by evaluating Commerce's 15-day policy (a policy that involves a number of competing factors associated with the administration of the dumping statute) without first receiving its views on this issue. The court, therefore, would have to remand this issue to receive Commerce's views on the record before considering JBF RAK's claim. This inefficiency was caused by JBF RAK's failure to raise the issue before Commerce.

Moreover, it appears that JBF RAK is proceeding from a faulty premise that the *SKF* decisions render Commerce's 15-day policy unlawful as a matter of law. Pl. Br. 18. This is incorrect. Although the *SKF* decisions represent persuasive authority (*i.e.*, declaring Commerce's 15-day policy unlawful as applied to that particular plaintiff), there are other decisions by the Court of International Trade that have sustained Commerce's 15-day policy as a reasonable interpretation of the statute. *See Mittal Steel Galati S.A.*, 502 F. Supp. 2d 1295; *Mittal Steel Galati S.A. v. United States*, 31 CIT 730, 491 F. Supp. 2d 1273 (2007); *Mukand Int. Ltd. v. United States*, 30 CIT 1309, 452 F. Supp. 2d 1329 (2006). There is no binding decision declaring Commerce's policy unlawful.

JBF RAK, for its part, does not even mention the other decisions as contrary authority. Instead, JBF RAK suggests that Commerce's 15-day policy is unlawful as a matter of law

without much discussion of the statutory scheme, contrary authority, or policy considerations associated with this issue. It is only in its reply brief that JBF RAK begins to discuss the legal framework of the 15-day rule. Pl. Reply Br. 10-11. Ultimately, JBF RAK's claim cannot be reviewed in its current form. Requiring exhaustion is appropriate here, not futile, because the court must have Commerce's views on its policy to properly consider the issue.

### C. Home Market Sales

#### 1. Ordinary Course of Trade

JBF RAK claims that Commerce miscalculated normal value by using certain home market sales made outside the ordinary course of trade. In its administrative case brief, JBF RAK argued that [[     ]] specific home market sales should be excluded from the calculation of normal value because they involved sales with aberrational prices and quantities. *See* Def. Ex. 6 (JBF RAK's Admin. Case Br. 4-10). More specifically, JBF RAK argued that these specific sales involved: (1) extremely small quantities, (2) abnormally high sales price, (3) an abnormal customer, and (4) abnormally high profit margins. *Id.*

In the *Final Results*, Commerce considered and rejected JBF RAK's arguments:

> The Department finds nothing striking about the sales in question that would justify their exclusion. While the quantities in the four sales are below average, they are part of a smooth distribution of quantities from low to high. These sales are among several sales that involved similarly small amounts. Accordingly, the Department does not find that the quantity involved in these four sales was aberrational compared to other sales made by JBF. The quantities involved in these sales are not extraordinary, but fall within the ordinary course of trade in the home market. Additionally, we find there were too few transactions of the CONNUM actually selected for matching to analyze accurately whether the sales prices were aberrational. Profit for these sales was higher than average and higher than for all other sales; however, as with quantity, profit is smoothly distributed from low to high providing no indication of a standard or normal profit rate or even range of rates. While prices and profit are higher than the other home market sales reported, and quantities lower, the variations in prices, quantities, and profits reflect JBF's normal business practice of sales and are not "extraordinary" under 19 CFR 351.102(b)(35) or "aberrational" (to use the language of *Thermal Paper*). . . . Importantly, JBF has not given the Department any reason to consider that

> these transactions differ from other sales in any respect, other than quantity, beyond its own pricing decisions and the willingness of the customers for these sales to pay higher prices. In other words, it has not demonstrated there is a reason why one would expect, prices and profits for these sales to be higher, such as the unusual product or sales aspects examined in *Mexican Cement* or *Thermal Paper*. JBF has not shown that these sales involve off-quality merchandise, were produced according to unusual product specifications, were sold pursuant to unusual terms of sale, or were sold to an affiliated party at a non-arm's length price. Accordingly, the Department finds that JBF has not established that these sales are outside the OCT and, therefore, we have not excluded these sales from our analysis.

*Issues and Decision Memorandum* at 3-4.

In this court proceeding, JBF RAK again argues that there are [[   ]] home market sales that should be excluded from Commerce's calculation of normal value because they were made outside the ordinary course of trade. Pl. Br. 14. In fact, JBF RAK has actually submitted the exact same arguments (without any revisions) that it presented to Commerce prior to the *Final Results*. Pl. Br. 14-18.

Under USCIT Rule 56.2, JBF RAK's brief must include "the issues of law presented together with the reasons for contesting or supporting the administrative determination, specifying how the determination may be arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, unsupported by substantial evidence; or, how the determination may be unwarranted by the facts to the extent that the agency may or may not have considered facts which, as a matter of law, should have been properly considered." USCIT Rule 56.2(c)(1).

Unfortunately, JBF RAK has simply recycled its argument from its administrative case brief (almost verbatim) without attempting to analyze Commerce's findings and conclusions against the operative standard of review. *See* Def. Ex. 6 (JBF RAK's Admin. Case Br. 4-10); Pl. Br. 14-18. For a fact-intensive ordinary course of trade issue, Commerce is the finder of fact, weighing the available record information and evaluating each of the relevant factors. *See*

*Cemex, S.A. v. United States*, 133 F.3d 897, 900 (Fed. Cir. 1998) ("*Cemex*"). The court, in turn, does not consider the problem *de novo*, or re-weigh the evidence anew, but instead reviews whether Commerce's determination is supported by substantial evidence, 19 U.S.C. § 1516a(b)(1)(B)(i), or more simply, whether Commerce reasonably concluded that the subject sales were made in the ordinary course of trade. *See Thai I-Mei Frozen Foods Co., Ltd. v. United States*, 616 F.3d 1300, 1307 (Fed. Cir. 2010) ("[T]he only question is whether Commerce reasonably concluded that it was appropriate to exclude sales outside the ordinary course of trade, given the available data and circumstances of this investigation.").

JBF RAK never mentions the operative standard of review. Pl. Br. 14-18. It never addresses Commerce's findings and conclusions in the *Issues and Decision Memorandum*. It just repeats the same arguments made prior to the *Final Results* without any consideration of Commerce's response and rejection of those very same arguments in the *Final Results*. Pl. Br. 14-18. For example, Commerce explained that JBF RAK failed to address whether the subject sales "involve off-quality merchandise, were produced according to unusual product specifications, were sold pursuant to unusual terms of sale, or were sold to an affiliated party at a non-arm's length price." *Issues and Decision Memorandum* at 3-4. JBF RAK does not discuss these factors that must also be considered (in addition to price and quantity) in determining whether sales fall outside the ordinary course of trade. *See Cemex*, 133 F.3d at 900 ("Commerce must evaluate not just one factor taken in isolation but rather . . . all the circumstances particular to the sales in question.") (internal quotations and citation omitted).

By failing to frame its arguments against the operative standard of review, *see* USCIT Rule 56.2(c)(1), JBF RAK has created an obvious problem for the court and the other litigants. If it were to review the issue in this context, the court would first have to assume the role of co-plaintiff, reframe Plaintiff's arguments under the substantial evidence standard of review (rather

than the *de novo* standard before the agency), and analyze Commerce's ordinary course of trade findings under that framework. In reviewing whether Commerce reasonably concluded that the subject sales were made in the ordinary course of trade, the court would also have to evaluate factors ignored by JBF RAK (*i.e.*, whether sales involve off-quality merchandise, unusual product specifications, unusual terms of sale, and affiliated party transactions). The court would in essence be litigating the issue for Plaintiff, something the court cannot do. *See United States v. Great Am. Ins. Co.*, 2013 WL 6820678, at *6 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *MTZ Polyfilms, Ltd. v. United States*, 33 CIT 1575, 1578, 659 F. Supp. 2d 1303, 1308 (2009) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). Accordingly, the court deems the issue waived.

### 2. Model Matching

JBF RAK also challenges Commerce's model-matching methodology for identifying the foreign like product. Pl. Br. 10. Goods imported into the United States will be subject to antidumping duties if Commerce determines that foreign merchandise is being sold in the United States at less than its fair value. *See* 19 U.S.C. § 1673. The amount of the antidumping duty reflects the amount by which the home-market price of the foreign like product (*i.e*, normal value) exceeds the price charged in the United States. *See* 19 U.S.C. § 1677b(a)(1)(A)-(B). The difference is referred to as the dumping margin. 19 U.S.C. § 1677(35)(A). To "establish the dumping margin, whether in an initial investigation or in an administrative review, Commerce must first identify the 'foreign like product' which will form the basis for comparison to

merchandise exported to the United States." *Fagersta Stainless AB v. United States*, 32 CIT 889, 889, 577 F. Supp. 2d 1270, 1275 (2008) ("*Fagersta*") (citing *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1375 (Fed. Cir. 2001) ("*Pesquera*"). The "process by which Commerce identifies the 'foreign like product' in determining dumping margins . . . is called 'model-matching.'" *Koyo Seiko Co. v. United States*, 551 F.3d 1286, 1289 (Fed. Cir. 2008). Commerce first attempts to match sales of dumped merchandise with sales of identical merchandise in the comparison market. 19 U.S.C. § 1677(16)(A). Where there is no identical merchandise, as is the case here, Commerce attempts to match sales in the United States with sales of a similar product in the comparison market. § 1677(16)(B)-(C).

Congress has not precisely defined the methodology by which Commerce must identify the foreign like product. It has implicitly delegated that gap-filling authority to Commerce. *Pesquera*, 266 F.3d at 1384. Commerce, in turn, has considerable discretion to construct a methodology for identifying the foreign like product in antidumping proceedings. *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008). Commerce has established a model-matching methodology that applies a hierarchy of commercially significant characteristics to identify a suitable foreign like product. Once Commerce has established such a hierarchy, it will not modify that methodology unless presented with "compelling reasons" to change it. *Fagersta*, 577 F. Supp. 2d at 1276. It is "not necessary to ensure that home market models are technically substitutable, purchased by the same type of customers, or applied to the same end use as the U.S. model." *Koyo Seiko Co., Ltd. v. United States*, 66 F.3d 1204, 1210 (Fed. Cir. 1995).

In the *Final Results*, Commerce rejected JBF RAK's proposed changes to its model-matching methodology:

> We have not made JBF's suggested changes to the matching methodology. The model-matching hierarchy used in the *Preliminary Results* consists of four criteria (in order of importance): specification, thickness in microns, thickness code, and

surface treatment. The model matching methodology used for these final results is the same as that used for the *Preliminary Results*, which is the same as that used in the investigation (excepting one minor difference, not relevant to this issue). When the Department has an established model-matching methodology in a proceeding, it may alter its established methodology if there is a reasonable basis for doing so. *See NTN Bearing Corp. of America v. United States*, 295 F.3d 1263, 1269 (CAFC 2002). With respect to changes to its model-matching methodology, the Department has applied a "compelling reasons" standard. *Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews*, 70 FR 54711 (September 16, 2005) and accompanying Issues and Decision Memorandum (DM) at Comment 2, and *Antifriction Bearings (Other Than Tailored Roller Bearings) and Parts Thereof From France; et al.: Final Results of Antidumping Duty Administrative Reviews*, 57 FR 28360 (June 24,1992) at General Issues, Comment 1. Compelling reasons that warrant a change to the model-matching methodology may include, for example, greater accuracy in comparing foreign like product to the single most similar U.S. model, in accordance with section 771(16)(B) of the Tariff Act of 1930, as amended (the Act), or a greater number of reasonable price-to-price comparisons in accordance with section 773(a)(1) of the Act. *See ex.*, *Stainless Steel Wire Rod from Sweden: Final Results of Antidumping Duty Administrative Review*, 72 FR 17834 (April 10, 2007) and accompanying IDM at Comment 2.

JBF has not provided compelling reasons for the Department to consider changing the model-match methodology from the methodology used in the *Preliminary Results* and the investigation. Under the Department's model matching hierarchy, we select a similar model for matching purposes according to: the list of characteristics, the order of the characteristics, and the ranking of choices under each characteristic. With respect to PET Film, the Department determined that four physical characteristics are needed to properly define the product: specification, micron, thickness code and surface treatment. Surface treatment, as the last listed characteristic, is the least consequential. Accordingly, only when all other characteristics are equal will U.S. products be matched to home market products with different surface treatments. As Petitioners note, the slate of other suggested matches offered by JBF for other U.S. products are unacceptable matches for a number of reasons outside of physical characteristics, including the contemporaneousness of sales and cost of production. Specifically, all suggested alternatives by JBF were either not sold within the matching window for the U.S. sales or were sold below cost. Also, its case brief is the first instance that JBF suggested a change in methodology, precluding the Department from the opportunity to collect additional necessary information to evaluate JBF's claims. Without such additional information, the Department has no basis to evaluate such arguments, beyond JBF's reference to one sentence in the cost verification report that mentions the apparent lack of materials or process involved in applying a corona surface to film.

*Issues and Decision Memorandum* at 5-6.

JBF RAK claims that Commerce's "match is materially different than the U.S. article while Plaintiff's match is materially the same and has the identical Cost of Production as the U.S. sales article." Pl. Br. 10.  Specifically, JBF RAK claims that Commerce should use a coated film rather than an uncoated film as a match for the U.S. product. Pl. Br. 11.  JBF RAK claims that its proposed match (which is acrylic coated on one side and corona[2] treated on the other) is a better match than Commerce's match (which is plain on one side and corona treated on the other). Pl. Br. 11.  JBF RAK claims that its suggested match "is the like product match contemplated by the statute and fulfills Commerce's stated goal of '. . . greater accuracy in comparing foreign like product to the single most similar U.S. model.'"  Pl. Br. 10.

Contrary to JBF RAK's claim, there is no compelling reason for Commerce to change its methodology.  Commerce applied the following hierarchy (consistently from the preliminary through the final determination) to identify the foreign like product: (1) specification, (2) thickness in microns, (3) thickness code, and (4) surface treatment. *See Issues and Decision Memorandum* at 5; *Preliminary Analysis Memorandum for JBF RAK LLC*, A-520-803, at 3 (Dec. 7, 2010).  Commerce, therefore, ranked "surface treatment" as the least important criterion to determine whether the home market product was similar to the U.S. product for purposes of matching. *See Issues and Decision Memorandum* at 5.  The U.S. product (*i.e.*, PET Film) is acrylic coated on one side with no treatment on the other side (acrylic coated, plain). Commerce's model-match from the home market is uncoated on one side with corona treatment on the other side (plain, corona treated).  Commerce concluded that the differences in surface treatments were inconsequential under its hierarchy.  Although not stated explicitly in the *Final Results*, there is no dispute that the other higher ranked characteristics (*i.e.*, specification,

---

[2] Corona is an electric charge applied to film that makes it more suitable for certain applications. *Issues and Decision Memorandum* at 4.

thickness in microns, thickness code) are the same between Commerce's proposed match and the U.S. product. *See Issues and Decision Memorandum* at 5 ("Accordingly, only when all other characteristics are equal will U.S. products be matched to home market products with different surface treatments."); Pl. Br. 11 ("All other characteristics of the U.S. sale product, Plaintiff's match, and [Commerce's] match are the same."). Given that these other characteristics rank higher than "surface treatment," Commerce's selection of the foreign like product in this case is consistent with its hierarchy.

JBF RAK, however, proposes an alternative match with different surface treatments. JBF RAK's proposed match is acrylic coated on one side with corona treatment on the other side (acrylic coated, corona treated). It argues that the corona treatment is insignificant because it does not add any material to the PET Film and merely provides a static electric charge. The other characteristics are also the same between JBF RAK's proposed match and the U.S. product. JBF RAK, therefore, contends that its proposed match is a better choice than Commerce's match because it has surface characteristics that more closely resemble the U.S. product.

Even if JBF RAK's proposed model-match is a better fit based on the differences in surface treatment (which would not render Commerce's choice unreasonable), there are other issues associated with JBF RAK's proposed model-match that make it unsuitable to serve as the foreign like product. Specifically, JBF RAK's proposed matches (sales) were sold either outside the matching window (*i.e.*, not contemporaneous) or below the cost of production. *See Issues and Decision Memorandum* at 6.

Under 19 U.S.C. § 1677f-1(d)(2), "when comparing export prices . . . of individual transactions to the weighted average price of sales of the foreign like product, the administering authority shall limit its averaging of prices to a period not exceeding the calendar month that

corresponds most closely to the calendar month of the individual export sale."). Commerce has promulgated a regulation implementing the contemporaneity requirement:

> Normally, [Commerce] will select as the contemporaneous month the first of the following which applies: (1) The month during which the particular U.S. sale under consideration was made; (2) If there are no sales of the foreign like product during this month, the most recent of the three months prior to the month of the U.S. sale in which there was a sale of the foreign like product; (3) If there are no sales of the foreign like product during any of these months, the earlier of the two months following the month of the U.S. sale in which there was a sale of the foreign like product.

19 C.F.R. § 351.414(f). This is known at the "90/60 window." *See, e.g.*, *AIMCOR v. United States*, 23 CIT 1000, 1006, 86 F. Supp. 2d 1248, 1255 n.4 (1999). Alternatively, under 19 U.S.C. § 1677b(b)(1), "[i]f the administering authority determines that sales made at less than the cost of production . . . such sales may be disregarded in the determination of normal value."

As Commerce observed, JBF RAK's proposed model-match involves sales that fall outside the "90/60 window" or sales "made at less than the cost of production." JBF RAK does not discuss this issue in its papers and focuses exclusively on the differing surface treatments. The court, therefore, must assume that JBF RAK does not contest Commerce's findings and conclusions on the question of contemporaneity and sales made below the cost of production. Accordingly, Commerce reasonably rejected JBF RAK's suggested changes to its methodology. Commerce's model-matching methodology for identifying a suitable foreign like product was reasonable in this case.

### IV. CONCLUSION

For the foregoing reasons, Commerce's *Final Results* are sustained. Judgment will be entered accordingly.

Dated:  January 8, 2014                          /s/ Judith M. Barzilay
       New York, New York                          Judith M. Barzilay, Senior Judge